# In the United States Court of Federal Claims

No. 02-1220 C

(E-Filed: October 27, 2003)

| | | |
|---|---|---|
| NAVAJO REFINING COMPANY, L.P., and MONTANA REFINING CO., Plaintiffs, v. THE UNITED STATES, Defendant. | ) | Military fuel supply contracts; unauthorized economic price adjustment clause; individual and class deviations from FAR §16.203; quantum valebant relief; summary judgment |

J. Keith Burt, Washington, DC, for plaintiff. Adrian L. Steel, Jr. and William C. Paxton, Washington, DC, and W. John Glancy, Dallas, TX, of counsel.

Steven J. Gillingham, with whom were Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, and Kyle Chadwick, United States Department of Justice, Washington, DC, for defendant. Bernard A. Duval and Howard M. Kaufer, Defense Energy Support Center, Fort Belvoir, VA, of counsel.

## OPINION AND ORDER

HEWITT, Judge

Plaintiffs, Navajo Refining Company, L.P. (Navajo) and Montana Refining Company (Montana) (collectively, plaintiffs), seek damages from defendant, the Defense Energy Support Center (DESC),[1] arising out of the use of an allegedly illegal economic price adjustment clause in a series of thirty-three competitively-awarded fuel supply contracts. The parties have filed cross-motions for partial summary judgment. For the following

---

[1]DESC is part of the Defense Logistics Agency (DLA) in the Department of Defense (DoD). Complaint (Compl.) ¶ 9. Facts cited to the pleadings or briefing of only one of the parties do not appear to be in dispute.

reasons, defendant's motion is DENIED, and plaintiffs' motion is GRANTED in part and DENIED in part.

I. Background

Navajo is a Delaware limited partnership with its principal place of business in Artesia, New Mexico. Defendant's Proposed Findings of Uncontroverted Fact (DPFUF) ¶ 1. Montana is a Montana general partnership with its principal place of business in Great Falls, Montana. Id. Both Navajo and Montana are subsidiaries of the Holly Corporation, id., a Delaware corporation engaged in the refining, transportation, terminaling, and marketing of petroleum products through its affiliates. See Holly Corporation at http://www.hollycorp.com/index.shtml (last visited Oct. 24, 2003). Plaintiffs have a combined refining capacity of approximately 67,000 barrels per day. DPFUF ¶ 1.

Between 1982 and 1999, DESC awarded plaintiffs thirty-three contracts for the supply of military jet fuel. Plaintiffs' Proposed Findings of Uncontroverted Fact (PFUF) ¶ 52; DPFUF ¶ 4. Under the contracts at issue in this case, plaintiffs delivered approximately 120.8 million gallons of jet fuels JP-4 and JP-8 to DESC. DPFUF ¶¶ 5, 7. Each of the fuel supply contracts was a fixed price contract that included an economic price adjustment (EPA) clause. See id. ¶ 9. The EPA clause in plaintiffs' contracts was DESC's principal EPA clause, Clause B19.33. Id. ¶¶ 9, 11.

Of the thirty-three fuel supply contracts that DESC awarded plaintiffs, Montana received fifteen of the awards from 1985 through 1999.[2] See Appendix to Plaintiffs' Cross-Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Partial Summary Judgment (Pls.' App.) at 114, 125, 135, 146, 159, 172, 187, 202, 204,

[2]The Montana contracts were: (1) Contract No. DLA600-86-D-0476 (1985 contract), Appendix to Plaintiffs' Cross-Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Partial Summary Judgment (Pls.' App.) at 114; (2) Contract No. DLA600-86-D-0855 (1986 contract), id. at 125; (3) Contract No. DLA600-87-D-0573 (1987 contract), id. at 135; (4) Contract No. DLA600-88-D-0585 (1988 contract), id. at 146; (5) Contract No. DLA600-89-D-0579 (1989 contract), id. at 159; (6) Contract No. DLA600-90-D-0529 (1990 contract), id. at 172; (7) Contract No. DLA600-91-D-0560 (1991 contract), id. at 187; (8) Contract No. DLA600-92-D-0528 (1992 contract), id. at 202; (9) Contract No. DLA600-93-D-0555 (1993 contract), id. at 204; (10) Contract No. DLA600-94-D-0516 (1994 contract), id. at 221; (11) Contract No. SPO600-95-D-0466 (1995 contract), id. at 234; (12) Contract No. SPO600-96-D-0525 (1996 contract), id. at 245; (13) Contract No. SPO600-97-D-0497 (1997 contract), id. at 251; (14) Contract No. SPO600-98-D-0488 (1998 contract), id. at 257; and (15) Contract No. SPO600-99-D-0521 (1999 contract), id. at 263.

221, 234, 245, 251, 257, 263. From 1984 through 1994, Montana's contracts included an EPA clause that adjusted the prices paid to Montana based on indexes published by the Department of Energy in the Petroleum Marketing Monthly (PMM Indexes). See DPFUF ¶ 14. From 1995 through 1999, Montana's contracts included EPA clauses based on an industry publication issued daily, the Oil Price Information Service (OPIS). Id. ¶ 16.

Navajo received eighteen contract awards from DESC between 1982 and 1999.[3] Pls.' App. at 269, 277, 286, 296, 307, 318, 330, 344, 358, 376, 391, 407, 423, 436, 457, 470, 498, 515. Navajo's 1982 contract contained an EPA clause that adjusted the prices paid to Navajo based on two industry publications, Platts Oilgram Price Report (Platts), a daily industry publication, and Oil Daily. DPFUF ¶¶ 13, 16. Navajo's 1983 contract contained an EPA clause that adjusted the prices paid to Navajo based on prices published by the Bureau of Labor Statistics (BLS). Id. ¶ 13. From 1984 to 1994, the contracts awarded to Navajo each contained an EPA clause that adjusted the prices paid to the contractor based on the PMM Indexes. Id. ¶ 14. Beginning in 1995, Navajo's contracts included an EPA clause based on Platts. Id. ¶ 16.

In MAPCO Alaska Petroleum, Inc. v. United States (MAPCO), the Court of Federal Claims held that DESC's use of EPA Clause B19.33 was inconsistent with the Federal Acquisition Regulation (FAR)[4] and therefore unauthorized. 27 Fed. Cl. 405, 407-08 (1992). Following the issuance of that decision, DESC sought agency approval from DLA for certain deviations from the FAR to permit the continued use of Clause B19.33 in DESC's fuel supply contracts. See DPFUF ¶¶ 18-26. DLA granted requests for individual deviations and a class deviation that together applied to eleven of the contracts awarded to plaintiffs in this case: the 1993 contract of Navajo, the 1995 through the 1999 contracts of

---

[3]The Navajo contracts were: (1) Contract No. DLA600-82-D-0636 (1982 contract), Pls.' App. at 269; (2) Contract No. DLA600-83-D-0892 (1982 contract), id. at 277; (3) Contract No. DLA600-84-D-0533 (1983 contract), id. at 286; (4) Contract No. DLA600-86-D-0459 (1985 contract), id. at 296; (5) Contract No. DLA600-86-D-0856 (1986 contract), id. at 307; (6) Contract No. DLA600-87-D-0574 (1987 contract), id. at 318; (7) Contract No. DLA600-88-D-0582 (1988 contract), id. at 330; (8) Contract No. DLA600-89-D-0578 (1989 contract), id. at 344; (9) Contract No. DLA600-90-D-0528 (1990 contract), id. at 358; (10) Contract No. DLA600-91-D-0559 (1991 contract), id. at 376; (11) Contract No. DLA600-92-D-0570 (1992 contract), id. at 391; (12) Contract No. DLA600-93-D-0503 (1993 contract), id. at 407; (13) Contract No. DLA600-94-D-0517 (1994 contract), id. at 423; (14) Contract No. SPO600-95-D-0500 (1995 contract), id. at 436; (15) Contract No. SPO600-96-D-0493 (1996 contract), id. at 457; (16) Contract No. SPO600-97-D-0496 (1997 contract), id. at 470; (17) Contract No. SPO600-98-D-0487 (1998 contract), id. at 498; and (18) Contract No. SPO600-99-D-0520 (1999 contract), id. at 515.

[4]The FAR can be found at Title 48 of the United States Code of Federal Regulations.

Navajo and the 1995 through the 1999 contracts of Montana, see id. ¶¶ 19, 20, 24, 25. These deviations are more particularly described in the next paragraph.

On January 14, 1993, DLA's Acting Executive Director granted an individual FAR deviation authorizing the use of the PMM-based EPA clause in all of the contracts awarded pursuant to the solicitation under which Navajo's 1993 contract was awarded. Id. ¶ 19. On November 15, 1994, DLA's Executive Director granted DESC's request for an individual FAR deviation to permit use of a market-based EPA clause in each of the contracts awarded pursuant to the solicitation under which Montana's 1995 contract was awarded. Id. ¶ 20. Pending review of DESC's January 1995 request for a class deviation from the FAR, DLA's Acting Executive Director granted, on March 2, 1995, an individual deviation allowing the use of the Platts-based EPA clause in the contracts awarded pursuant to the solicitation under which Navajo's 1995 contract was awarded. Id. ¶ 24. Subsequently, on October 5, 1995, the Director of Defense Procurement granted DESC's request for a class deviation from the FAR permitting the use of DESC's EPA clause. The 1996, 1997, 1998 and 1999 fuel supply contracts for both Navajo and Montana were awarded pursuant to the class deviation. Id. ¶ 25.

Plaintiffs filed suit in September 2002 alleging various causes of action, in particular, contract illegality, misrepresentation as inducement to contract, breach of contract, quantum valebant or implied-in-fact contract, failure of consideration and frustration of the purpose of the contract, mistake and taking. See Compl. ¶¶ 32-91. Defendant moved for partial summary judgment on: (1) whether the EPA clauses used in plaintiffs' contracts were illegal; (2) whether the FAR deviations permit use of the EPA clauses in plaintiffs' contracts; (3) whether plaintiffs are entitled to recover under a quantum valebant theory and (4) whether plaintiffs have waived their claims of illegality. See Defendant's Motion for Partial Summary Judgment (Def.'s Mot.) at 2. Plaintiffs have cross-moved for partial summary judgment on: (1) whether their contract prices were illegal; (2) whether the FAR deviations were valid; (3) whether they are entitled to recover under a quantum valebant theory and (4) whether, pursuant to the principles of judicial estoppel, plaintiffs are entitled to the fair market value calculation to which defendant stipulated and which the court adopted in Pride Cos. v. United States, No. 95-597C, 2000 U.S. Claims LEXIS 213 (May 10, 2000). See Plaintiffs' Cross-Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Partial Summary Judgment (Pls.' Cross-Mot.) at 1, 7-8.

Upon reviewing the parties' briefing, it appeared to the court that the parties' legal arguments in this case were squarely addressed in the court's recently published Opinion and Order in the case of La Gloria Oil & Gas Co. v. United States, 56 Fed. Cl. 211 (2003). By Order of May 28, 2003, the court directed the parties to file briefs "stating the particular respects in which this case is distinguishable from the La Gloria case." Order of

May 28, 2003. Plaintiffs responded that "the present case is materially indistinguishable from La Gloria." Plaintiffs' Response to Court Order of May 28, 2003 at 1. Defendant stated that "there are no relevant particulars to distinguish this case from LaGloria." Defendant's Response to Court Order of May 28, 2003 at 1. Subsequently, the court requested additional briefing addressing the waiver issue and the particular contract language or terms upon which the parties relied to support their respective arguments. See Plaintiffs' Response to Court Order of July 31, 2003; Defendant's Response to July 31, 2003 Order.

## II. Discussion

### A. Standard of Review

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims (RCFC) 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). A genuine dispute of material fact that may significantly affect the outcome of the matter precludes the entry of judgment. Anderson, 477 U.S. at 248. When considering cross-motions for summary judgment, as in this case, the court evaluates each motion under the same standard. Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. 450, 457 (1999). Issues of contract interpretation are appropriate for summary judgment. See Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996) ("Contract interpretation is an issue of law."); P.J. Maffei Bldg. Wrecking Corp. v. United States, 732 F.2d 913, 916 (Fed. Cir. 1984) ("[A] matter of contract interpretation . . . presents a question of law."). The cross-motions focus on issues of contract interpretation--whether defendant's EPA clause is authorized by the FAR or, if not, whether the use of the clause was authorized by deviations from the FAR. Def.'s Mot. at 2; Pls.' Cross-Mot. at 7. The cross-motions also address whether plaintiffs are entitled to a quantum valebant theory of recovery, the applicability of the affirmative defense of waiver and whether the principles of judicial estoppel are appropriate. Def.'s Mot. at 2; Pls.' Cross-Mot. at 7-8.

### B. Whether the EPA Clauses Used in Plaintiffs' Contracts were Illegal

Plaintiffs argue that defendant illegally established the price of fuel in their contracts in violation of the governing FAR Subpart 16.2. Pls.' Cross-Mot. at 9-28. Citing Barrett Refining Corp. v. United States, 242 F.3d 1055 (Fed. Cir. 2001) (Barrett III) and MAPCO, 27 Fed. Cl. 405, plaintiff asserts that the price escalation clause used in its fuel supply contracts with defendant is unauthorized and unenforceable. Pls.' Cross-Mot. at 9.

Plaintiffs contend that the illegality of defendant's fuel supply contract prices is

further established by: (1) the rejection of defendant's interpretation of the pertinent FAR provisions by the principal drafter of FAR § 16.203, Ms. Etha Quinn, id. at 16-17, and (2) defendant's "admissions" of illegality in the Federal Register, following MAPCO, 27 Fed. Cl. 405, and in the cases of Pride Cos., 2000 U.S. Claims LEXIS 213, and Phoenix Petroleum Co. v. United States, No. 98-5124, 1999 U.S. App. LEXIS 16939 (Fed. Cir. July 23, 1999). Id. at 13-15

Defendant contends that the FAR does not prohibit the use of its EPA clause. Defendant's Reply and Opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment and Supplemental Appendix (Def.'s Reply) at 7-18. Defendant adds that "[t]he FAR does not mandate particular EPA clauses." Id. at 8. Reasoning that "neither the absence of authority to use a clause nor nonmandatory guidance concerning the clause can be relied upon to urge prohibition of a clause," Def.'s Mot. at 15, defendant asserts that the EPA clauses used by DESC are "authorized." See id. at 14.

Citing Armco, Inc. v. Commissioner, 87 T.C. 865 (1986), defendant urges the court to disregard the declaration of Ms. Quinn, a committee member of the 1978 FAR Project, and her interpretation of the FAR provisions on the ground that the views were personal, were not contemporaneous with the promulgation of the regulation and were not prepared as public guidance. Def.'s Reply at 15. Defendant also cites MAPCO for the proposition that "'post hoc statements by drafting officials . . . hold no probative value, especially when uttered "in the context of a vigorous dispute."'" Id. (quoting MAPCO, 27 Fed. Cl. at 409 n.6 (quoting Honeywell, Inc. v. United States, 661 F.2d 182, 185 (Ct. Cl. 1981))).

Defendant also argues that plaintiffs' assertions concerning DESC's prior "admissions" of illegality have been "unfairly characterized." Def.'s Reply at 15-16. Defendant adds that "[a]dmissions and concessions of law are generally not, in any event, binding upon a court and, thus, do not bind parties." Id. at 16 (citing Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 289 (1917); Rogers v. Office of Personnel Mgmt., 87 F.3d 471, 475 (Fed. Cir. 1996)).

In MAPCO, and more recently in Gold Line Refining, Ltd. v. United States, 54 Fed. Cl. 285 (2002) (Gold Line), the court has directly considered and addressed at length the parties' arguments with respect to FAR § 16.203, specifically whether or not FAR § 16.203-1 is mandatory and whether DESC's EPA clause, Clause B19.33, comports with the FAR. The parties' legal arguments in this case are substantially the same as the arguments advanced in the MAPCO, Gold Line, and La Gloria cases. As discussed more fully in the published decisions of MAPCO and Gold Line, it is the view of this court, "that the phrase 'of three general types' in FAR 16.203-1, limits the permissible categories of EPA clauses." Gold Line, 54 Fed. Cl. at 292. The Gold Line opinion explains:

> Based on basic principles of statutory construction and the text of FAR 16.203-1, the "Description" provision, and FAR 16.203-3, the "Limitations" provision, it is the court's view that the use of agency-prescribed EPA clauses must be restricted to types of EPA clauses that are based either on fluctuations in labor or material costs or on changes in the contractor's established prices that are reflective of industry-wide contingencies. See FAR 16.203-2. Accordingly, the court construes the FAR provisions as restrictive rather than illustrative.

Id.

Moreover, as the court recently observed in La Gloria , notwithstanding that various factual statements in the declaration of Ms. Etha Quinn are consistent with both the regulatory history describing the purpose of the 1978 FAR Project and the views of the court in MAPCO and Gold Line that price indexes are not contemplated by FAR § 16.203, Ms. Quinn's testimony was prepared in connection with the MAPCO litigation and is therefore of limited evidentiary assistance to the court. See La Gloria , 56 Fed. Cl. at 216; see also MAPCO, 27 Fed. Cl. at 409 n.6. This court does not rely on her declaration.

Nor is the court persuaded by plaintiffs' arguments that defendant has admitted, in prior legal proceedings, the illegality of its EPA clauses. As the Federal Circuit observed in Rogers v. Office of Personnel Mgmt., concessions of law are not binding on a court. 87 F.3d at 475.

Rather, upon examining the language of the FAR and interpreting the pertinent regulatory provisions in accordance with the principles of statutory construction, the court determines that DESC's standard price escalation clause was not a type of EPA clause permitted by the FAR.[5]

### C. Whether FAR Deviations Permit Use of the EPA Clause in Plaintiffs' Contracts

Plaintiffs argue that the individual and class deviations that defendant obtained for eleven of the thirty-three contract awards "are invalid and without effect." Pls.' Cross-Mot. at 28. Plaintiffs assert that "DESC did not obtain its deviations in accordance with the law." Id.

---

[5]The court notes that an alternative conclusion was reached in Williams Alaska Petroleum, Inc. v. United States, No. 02-705 C, 2003 U.S. Claims LEXIS 267 (Oct. 1, 2003).

Plaintiffs contend that DESC sought and improperly relied upon a series of individual deviations between 1993 and 1995 to avoid the publication and approval requirements associated with obtaining a "class deviation." See id. at 30-31. Plaintiffs point out that, rather than obtaining an individual deviation for each separate fuel supply contract entered, defendant applied an individual deviation to a solicitation under which multiple contracts were awarded. See id. at 31. Plaintiffs add that: (1) in violation of Section 22 of the Office of Federal Procurement Policy Act, FAR Subpart 1.5, and DLAR § 1.490(b),[6] defendant failed to publish its deviation requests, see id. at 32-34; (2) in violation of DLAR § 1.490(b), defendant did not obtain the proper approval by the DAR council for the class deviation request, see id. at 35 and (3) in violation of FAR §§ 52.103(a) and 52.252-5, defendant failed to notify each contractor that DESC was deviating from the FAR in establishing its contract prices, id. at 36-37.[7]

Reiterating that the EPA clauses in plaintiffs' contracts do not "impermissibly conflict with FAR 16.203," Def.'s Mot. at 11, defendant argues that the legality of the EPA clauses used in eleven of plaintiffs' contracts is "independently established" by the fact that DESC sought "legally authorized" deviations permitting their use. Id. Defendant contends that "[t]he EPA clauses contained in 11 of Navajo and Montana's contracts (one PMM-based clause, five OPIS-based clauses, and five Platts-based clauses) were covered by individual or class deviations expressly authorizing their use." Id. at 11-12 (footnote omitted).

Defendant argues that plaintiff's "technical and procedural arguments" with respect to DESC's "imperfect" paperwork in obtaining the deviations must fail because plaintiffs "do not claim, much less establish, that the deviation process . . . caused any . . . actionable harm." Def.'s Reply at 18-19. Defendant asserts that plaintiffs have failed to explain how they were prejudiced by the lack of extra paper work and processes to "formally announce[], after MAPCO, that officials had approved the continued use of the market-based EPA clauses, not prescribed by the FAR, that DESC had used, in similar form, since the early 1980s." Id. at 19.

---

[6]The current Defense Logistics Acquisition Directive (DLAD) was formerly the Defense Logistics Acquisition Regulation (DLAR). See Def.'s Reply at 23.

[7]The court declines to address plaintiffs' arguments concerning defendant's alleged violation of the Regulatory Flexibility Act (RFA), 5 U.S.C. §§ 601-612 (2000). See Pls.' Cross-Mot. at 37-40. The express terms of the RFA provide that only "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements [of certain prescribed statutory provisions]." 5 U.S.C. § 611(a)(1). Because plaintiffs are not small businesses, they lack standing to challenge defendant's compliance with the requirements of the RFA.

1. The Individual Deviations

At the time that DESC sought individual deviations for Navajo's 1993 contract, Montana's 1995 contract and Navajo's 1995 contract, FAR § 1.403 stated that "[i]ndividual deviations affect only one contracting action." FAR § 1.403 (1995); FAR § 1.403 (1993) (emphasis added). The court recently construed the meaning of the FAR § 1.403 term "contracting action" in La Gloria:

> Of particular interest is the discussion in the Federal Register addressing the 2002 language change throughout the FAR from "contracting action" to "contract action." The proposed rule states that "[t]he Councils do not intend to make any substantive change to the FAR by this proposal." Proposed Rule for Federal Acquisition Regulation: Definitions for "Contract Action" and "Contracting Action," 65 Fed. Reg. 34894 (May 30, 2000). The final rule states that it "amends the FAR to provide for consistent use of the term 'contract action,'" and to that end, "[t]he rule changes the term 'contracting action' to 'contract action' throughout the FAR and makes other editorial changes to clarify the text." Final Rule for Federal Acquisition Regulation: Definitions for "Contract Action" and "Contracting Action," 67 Fed. Reg. 13053-1 (Mar. 20, 2002).
>
> The regulatory provision in effect from March 2002 forward states that "[i]ndividual deviations affect only one contract action." FAR § 1.403. The court interprets "one contract action" to mean, unambiguously, an action related to one contract award.
>
> The interpretation of FAR § 1.403 before and after March 2002 as referring to a single contract award is supported as well by the text of FAR § 5.001, in effect both before and after March 2002, which defined a "contract action" as "an action resulting in a contract," see 50 Fed. Reg. 1726, 1728 (Jan. 11, 1985) (emphasis supplied), not, as defendant urges, an action resulting in many contracts. See Def.'s Reply at 13. It is also supported by the text of DLAR § 1.403 in effect both before and after the March 2002 change in FAR § 1.403, which provides that individual deviations "affect only one contract or transaction." See Pl.'s App. at 99. Because the court construes the term "contracting action" in FAR § 1.403 to apply to only one contract, it is the opinion of the court that defendant obtained [its] individual deviations, each of which applied to multiple contracts, in violation of the FAR.

La Gloria, 56 Fed. Cl. at 219.

The parties' legal arguments concerning the individual deviations obtained for the contracts in this case are identical to the arguments asserted in La Gloria. See Pls.' Cross-Mot. at 28-37; Def.'s Reply at 18-22. The particular contracts for which defendant asserts that it sought and obtained individual deviations are: (1) Navajo's 1993 contract which contained a PMM-based EPA clause; (2) Montana's 1995 contract which contained an OPIS-based EPA clause and (3) Navajo's 1995 contract which contained a Platts-based EPA clause. See Def.'s Mot. at 8; DPFUF ¶ 19 (1993 Navajo contract); id. ¶¶ 16, 20 (1995 Montana contract); id. ¶ 24 (1995 Navajo contract). The individual deviations at issue, however, were not sought for plaintiffs' individual contracts. Rather, defendant sought and obtained the individual deviations to apply to the multiple-award solicitations under which plaintiffs received their particular contract awards. Def.'s Mot. at 8. Based on the court's interpretation of the term "contracting action" as contemplated by FAR § 1.403 at the time defendant sought the individual deviations for plaintiffs' contracts, it is the view of the court that defendant obtained the individual deviations for Navajo's 1993 contract, Montana's 1995 contract and Navajo's 1995 contract in violation of the FAR.

2. The Class Deviation

FAR § 1.404 provides that a class deviation applies to "more than one contract action." FAR § 1.404 (2003). The FAR also provides that "[w]hen an agency knows that it will require a class deviation on a permanent basis, it should propose a FAR revision, if appropriate." Id.

Because defendant sought internal agency approval of a permanent regulatory revision in the same document in which it requested a class deviation, the parties' dispute the validity of the defendant's class deviation. See Def.'s Reply at 21; Pls.' Cross-Mot. at 32 n.36. The parties dispute in particular whether the pertinent regulations require a proposed deviation to be published, and if so, whether defendant in fact satisfied the publication requirements. See Def.'s Reply at 21-22; Pls.' Cross-Mot. at 32-34. It is undisputed that defendant did publish its proposed permanent FAR revision and that defendant relies on that publication for compliance with the publication requirements applicable to its class deviation. See Def.'s Reply at 21; Pls.' Cross-Mot. at 32 n.36.

a. Whether Publication of the Class Deviation Request Was Required

Citing FAR subpart 1.5, DLAR § 1.490(b) and section 22 of the Office of Federal Procurement Policy Act (the OFPP Act), plaintiffs argue that defendant was required to publish for public comment each of its requests to deviate from the FAR. Pls.' Cross-Mot. at 32-34.

Defendant contends that it was not required to publish its proposed class deviation.

Def.'s Reply at 21. Defendant asserts that it nonetheless published a notice of its requested FAR revision for the use of an EPA clause of which plaintiffs had actual notice. Id. at 21-22.

The FAR does not specifically address publication requirements for class deviations. However, the FAR does require that for "significant revisions" to FAR provisions, "[t]he opportunity to submit written comments on proposed significant revisions shall be provided by placing a notice in the Federal Register." FAR § 1.501-2(b) (2002) (emphasis added); Pls.' App. at 76 (emphasis added). A significant revision "alter[s] the substantive meaning of any coverage in the FAR System having a significant cost or administrative impact on contractors [or having] a significant effect beyond the internal operating procedures of the issuing agency." FAR § 1.501-1 (2002); Pls.' App. at 76.

DLAR § 1.490(b), by contrast, does require publication for certain class deviations. It provides that "[r]equests for class deviations which have a significant cost or administrative impact upon contractors or offerors must be published in the Federal Register" and, following publication, must be approved by the DAR council. See Pls.' App. at 107 (containing DLAR § 1.490(b) (2000)).

Section 22 of the OFPP Act does not specifically address class deviations but contains publication requirements for certain categories of procurement changes, in particular, changes in "procurement policy, regulation or, procedure, or form." 41 U.S.C. § 418b (2000). Section 22 of the OFPP Act prohibits a "procurement policy, regulation, procedure, or form . . . that has (1) a significant effect beyond the internal operating procedures of the [issuing] agency . . . or (2) a significant cost or administrative impact on contractors or offerors" from taking effect until sixty days after publication of the proposed procurement policy, regulation, procedure or form in the Federal Register for public comment. 41 U.S.C. § 418b(a).

Defendant contends that, consistent with FAR pt. 1.5, it did publish a proposed FAR revision in its 1995 Federal Register publication. Def.'s Reply at 21; see Appendix to Defendant's Motion for Partial Summary Judgment (Def.'s App.) Ex. 14 (containing the relevant Federal Register pages). Defendant asserts that because the proposed FAR revision was "substantively identical" to the class deviation, its 1995 publication in the Federal Register effectively publicized its request for a class deviation. Def.'s Reply at 21. Defendant also argues that by publishing for public comment the substance of its class deviation request as its proposed FAR revision, it also satisfied the publication requirements of section 22 of the OFFP Act. Id. at 22. Defendant adds that no publication requirement under section 22 of the OFFP Act exists for an individual deviation because such deviation is not deemed a "procurement policy, regulation, procedure, or form" as contemplated by 41 U.S.C. § 418b. Id.

Plaintiffs point to evidence that during the same time period DESC sought the permanent class deviation at issue here, defendant published proposed deviations from FAR requirements for other procurements. See Pls.' Cross-Mot. at 34. Plaintiffs specifically reference (1) DoD's proposed "deviation from the [FAR] record keeping and physical inventory requirements for Special Tooling, Special Test Equipment and Plant Equipment with an acquisition cost of $1,500 or less" published in March 1995, see Pls.' App. at 950 (quoting 60 Fed. Reg. 15,740, 15,740 (Mar. 27, 1995) (to be codified at 48 C.F.R. pts. 45 and 52)) and (2) DoD's proposed deviation "from the [FAR] that simplifies the method of determining rental charges for government property" published in September 1995, see Pls.' App. at 953 (quoting 60 Fed. Reg. 46,259, 46,259 (Sept. 6, 1995) (to be codified at 48 C.F.R. pt. 52)). Pls.' Cross-Mot. at 34.

The record in this case establishes that, by memorandum dated January 4, 1995, accompanying defendant's request for internal regulatory approval of the class deviation and the proposed FAR revision, defendant conceded that the substance of the class deviation is of a type and significance that requires publication under the DLAR and the OFPP Act. See Def.'s App. Ex. 13. Defendant stated:

> In accordance with FAR 1.301(b) and Subpart 1.5 and as required by section 22 of the Office of Federal Procurement Policy Act, DLA intends to have this revised DLAR language [pertaining to authorized economic price adjustment clauses] published for public comment, because the coverage will have a significant effect beyond the internal operating procedures of DLA and may have a modest impact on contractors and offerors.

Id.

As the court stated in La Gloria,

> Defendant's own requests for the class deviation and proposed FAR revision at issue acknowledge that the impact of its request was significant enough to trigger the regulatory publication requirements of FAR subpart 1.5 (as to the proposed FAR revision) and § 22 of the OFPP Act. Although defendant did not reference the DLAR, the terms of the DLAR apply as well to requests for class deviations and impose the same standard for Federal Register publication as FAR § 1.505-1 and § 22 of the OFPP Act.

56 Fed. Cl. at 221.

The court further observed, "[n]otwithstanding that the proposed revision was 'substantively identical' to the class deviation, notice of the proposed revision does not

provide notice of defendant's intent to use immediately its illegal EPA clause prior to the FAR revision, as is required by DLAR § 1.490(b)." Id. at 220-21 (internal citation omitted). The distinction articulated in La Gloria between notice of a permanent revision (or permanent deviation) and notice of a class deviation is that "published notice of a permanent FAR revision informs the public of a potential, but not immediate, change in the law, while published notice of a class deviation informs the public of an immediate, but not permanent, change in the law." Id. at 221. That reasoning applies as well here. Defendant did not publish notice of its class deviation, and in contravention of DLAR § 1.490(b), defendant did not seek DAR Council review and approval of its request for a class deviation.

Moreover, although section 22 of the OFFP Act does not specifically address class deviations, the court finds that a class deviation may fall within any of the various categories of procurement changes identified in the OFFP Act--in particular, changes in procurement policy, regulation, procedure or form--that require publication in the Federal Register under the OFFP Act. See 41 U.S.C. § 418b. It is the view of the court that defendant's notice of a possible FAR revision failed to afford notice in compliance with section 22 of the OFPP Act.

As this court concluded in La Gloria,

> The court finds that, based on the regulatory publication requirements and the acknowledged impact of the proposed class deviation, publication of the class deviation was required by the DLAR and § 22 of the OFPP Act. Defendant did not publish notice of the proposed class deviation and, contrary to defendant's assertion, the published notice of the proposed permanent revision did not provide notice of the class deviation. Because defendant obtained the class deviation in contravention of the publication requirements established by DLAR § 1.490, defendant's own regulation, and § 22 of the OFPP Act, the class deviation was not authorized . . . .

56 Fed. Cl. at 221-22. Similarly here, the court finds that the class deviation is not valid for plaintiffs' 1996, 1997, 1998 and 1999 contracts.

b. Whether the Class Deviation Expired After Three Years

Defendant's class deviation was approved by a letter from the Director of Defense Procurement to DLA's Deputy Director of Acquisition dated October 5, 1995. See Pls.' App. at 886. Relying on the language of DLAR § 1.490(a)(i), plaintiffs argue that even if defendant's class deviation is valid, it expired on October 5, 1998. See Pls.' Cross-Mot. at 40. Defendant contends that the DLAR does not mandate "any . . . time limit." Def.'s

Reply at 23.

DLAR § 1.490(a)(i) states that, with respect to requests for authority to deviate from the provisions of the FAR or DFARS, "[r]equests for new deviations which will be needed beyond the normal three year expiration period should be submitted . . . as permanent deviations to be incorporated into the DLAD." Pls.' App. at 107 (quoting DLAR § 1.490(a)(i) (2000)). Analyzing this regulatory provision in La Gloria, the court stated:

> According the ordinary and common meaning of the words "normal" and "expiration" to their use in the phrase "normal three year expiration period" in DLAR § 1.490(a)[(i)], see 2A [Norman J. Singer, Statutes and Statutory Construction] § 47:27, at 336-338 [(6th ed. 2000)], the court understands "normal" to mean "[a]ccording to a regular pattern . . . [or] . . . to an established rule or norm," see Black's Law Dictionary (7th ed. 1999), and understands "expiration" to mean "[a] coming to an end." Id. Applying the "plain meaning rule" of statutory interpretation, see [Singer, supra,] § 46:01, at 113, to interpret the phrase "beyond the normal three year expiration period" in DLAR § 1.490(a)[(i)], the court construes that language to impose, in ordinary circumstances, a three-year time limitation on the validity of a class deviation. In this case, defendant did not argue that an extension of time was warranted by any circumstance out of the ordinary.

56 Fed. Cl. at 222. Applying the reasoning articulated in La Gloria in this case, the court finds that, "[a]bsent argument by the parties that a special circumstance warranted deviation from the 'normal . . . expiration period,' . . . plaintiff[s'] 1999 contract[s] [were] awarded after the expiration of the class deviation and [were] therefore not covered by it." Id.

c. Whether Defendant Was Required to Label Clause B19.33 as a Deviation

In violation of FAR §§ 52.103(a) and 52.252-5, plaintiffs argue that defendant did not label its EPA clause, Clause B19.33, as a "(DEVIATION)" and, as a result, failed to provide express notice to the contractors in their contracts that defendant was deviating from the FAR in establishing and adjusting the contract prices. Pls.' Cross-Mot. at 36-37. Defendant does not address this particular argument of plaintiffs but does assert that providing plaintiffs with published notice was unnecessary because plaintiffs "had actual notice that DESC was not using a FAR-prescribed EPA clause." Def.'s Reply at 22.

FAR § 52.103(a) requires the identification, by number, title and date, of provisions and clauses used in a solicitation or contract and states that "if the FAR provision or clause is used with an authorized deviation . . . the contracting officer shall then insert '(DEVIATION)' after the date." FAR § 52.103(a) (2002); Pls.' App. at 93. FAR §

52.252-5 governs the use of authorized deviations in provisions and states that "[w]henever any FAR or supplemental provision is used with an authorized deviation, the contracting officer shall identify it by the same number, title, and date assigned to the provision when it is used without deviation . . . except that the contracting officer shall insert (DEVIATION) after the date of the provision." FAR § 52.252-5 (2002); Pls.' App. at 101.

Although the parties have not addressed this point as fully in this case as they did in the La Gloria case, the parties here have acknowledged no material distinction between the two cases. Accordingly, the court applies the same regulatory analysis here. As the court stated in La Gloria, "FAR § 52.103(b) requires that '[a]ny provision or clause that supplements the FAR' must be clearly identified 'by number, title, date, and name,' and further requires that if such supplemental provision or clause is used with an authorized deviation, it must also be labeled '(DEVIATION).'" 56 Fed. Cl. at 224. The court finds that the labeling requirements prescribed in FAR § 52.103(b) are also applicable in this case and that defendant failed to comply with that regulatory requirement.

D. Whether Plaintiffs are Entitled to Recover Under a Quantum Valebant Theory for Defendant's Use of Unauthorized EPA Clauses in Plaintiffs' Contracts

Plaintiffs assert a right to recover the fair market value of the fuel delivered to defendant under a quantum valebant theory. Pls.' Cross-Mot. at 41-44. Plaintiffs argue that because they "did not receive a lawful price for their fuel, they have been harmed as a matter of law." Id. at 59. Plaintiffs allege that the initial contract price "was improperly impacted by DESC's use of the illegal price clause and Plaintiffs were thereby harmed, regardless of whether, as a matter of happenstance, changes in Plaintiffs' costs tracked precisely every change in prices calculated pursuant to the clause." Id. at 62-63 (footnote omitted).

Defendant contends that plaintiffs have failed to establish that they were harmed by the use of the EPA clause. Def.'s Reply at 24-33. Defendant points out that plaintiffs have not alleged "that the Government failed to meet its contractual responsibilities . . . [but rather] that the Government violated a regulatory obligation, which, Navajo and Montana assert, overrides the fact that the Government met its contractual obligations completely." Id. at 26 (emphasis omitted). Defendant asserts that to establish harm, plaintiffs must show "at a minimum, . . . that the combination of their base prices and some presumably 'legal' escalation clauses would have resulted in a greater return than they actually received." Id. at 29 (footnote omitted). Defendant suggests that "some presumably 'legal' escalation clauses" might include a cost index calculator chosen by the Government "or, if Navajo['s] and Montana['s] prices could have met the qualifications of FAR 16.203-4, a contractor

'established price' escalator." Id. at 29 n.13.

In La Gloria, the court directly addressed similar arguments. See 56 Fed. Cl. at 224-25. Relying on the Federal Circuit's decision in Barrett Refining Co. v. United States, 242 F.3d 1055 (Fed. Cir. 2001) (Barrett III), the court stated:

> On appeal, the Federal Circuit declined to disturb the trial court's finding that "once the unauthorized [price escalation] clause is struck out, . . . [the] express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value for the fuel delivered by [the contractor] under the contract." 242 F.3d at 1059 (quoting Barrett II, 45 Fed. Cl. at 170). The Federal Circuit stated:
>
>> Given that the price escalation clause was unauthorized and unenforceable, . . . we agree with the Court of Federal Claims' implicit legal conclusion that there was no longer any express clause covering price escalation, and thus, nothing to preclude an implied-in-fact agreement on that term. We also agree with the Court of Federal Claims' factual finding of a promise by the government to pay at least fair market value.
>
> 242 F.3d at 1060.

La Gloria, 56 Fed. Cl. at 224.

The court in La Gloria observed that "[t]he EPA clause addressed in Barrett III is substantially the same as the EPA clause used in La Gloria's contracts, which [like the contracts in Barrett III] have also been fully performed." Id. Moreover, the La Gloria court noted that "there is evidence in this case that supports a finding that defendant promised to pay fair market value for the military fuel it procured." Id. The evidence to which the court referred was a "1993 memorandum prepared by the DLA requesting 'an interim deviation from FAR [§] 16.203 to permit DFSC [DESC's predecessor agency] to continue the use of . . . [its EPA] provisions . . .' following the MAPCO decision." Id. The 1993 memorandum stated, in particular:

> D[E]SC contracts contain EPA provisions based on market indexes of the product being purchased or of a similar product. All EPA references are tested for accuracy and then recommended for use by D[E]SC's Office of Market research and analysis. These EPA provisions ensure that the Government, like commercial customers, will pay the market price for the fuel throughout the duration of the contract, whether market prices increase

> or decrease.

Id. at 225. The court in La Gloria construed DESC's representation that "'the [g]overnment, like commercial customers, [would] pay the market price for the fuel throughout the duration of the contract,' to be a commitment to pay fair market value to contractors supplying the fuel." Id. (internal citation omitted).

The court in La Gloria concluded that, in similar circumstances, the La Gloria plaintiff was entitled to prove harm under a quantum valebant theory:

> The Federal Circuit decision in Barrett III teaches that the use of an illegal EPA clause together with an implied-in-fact governmental promise to pay at least fair market value entitles a plaintiff to quantum valebant relief. Because it is the court's view that the EPA clause used in plaintiff's contracts was unauthorized and that the government evinced an intention to pay fair market value for its fuel supply procurements, the court finds that, consistent with the Federal Circuit's guidance in Barrett III, plaintiff is entitled to quantum valebant relief. In determining the quantum valebant relief, the measure of actual harm incurred by La Gloria must be determined. Thus, contrary to defendant's assertions, plaintiff is entitled to prove harm by establishing, under an appropriate valuation methodology, that it failed to receive fair market value.

Id.

In this case, as in La Gloria, plaintiffs have fully performed their fuel supply contracts, each of which contained an unauthorized EPA clause, and plaintiffs "have presented the same evidence [considered by the court in La Gloria] of the parties' intent." Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment at 18; see also Def.'s App. Ex. 5. Applying the reasoning articulated in Barrett III and La Gloria to this case, the court finds that "the use of an illegal EPA clause together with an implied-in-fact governmental promise to pay at least fair market value" entitles plaintiffs an opportunity to prove damages under a quantum valebant theory. See 56 Fed. Cl. at 225.

E. Whether Plaintiffs Have Waived Their Claims of Illegality

Defendant asserts that by continuing to contract over a period of seventeen years, plaintiffs have waived their claims of illegality. Def.'s Reply at 33-42. Defendant states that plaintiffs "without objection" submitted offers that met the contract terms proposed in defendant's solicitations. Id. at 34.

Citing Cessna Aircraft Co. v. Dalton, 126 F.3d 1442, 1451 (Fed. Cir. 1997), plaintiffs argue that, as a matter of law, they could not waive their right to a remedy for the illegal pricing clause in their fuel supply contracts. Pls.' Cross-Mot. at 64. Plaintiffs add that defendant cannot benefit from its use of an illegal pricing clause in its contracts. Id. at 65. Plaintiffs note that unlike "contractors who had actual knowledge that an unlawful provision was in the contract when they signed it," Pls.' Cross-Mot. at 68 n.75, they "did not know that the clause was unlawful," id. at 68 n.74.

The parties represented in briefing in response to an inquiry from the court that their arguments in this case are materially indistinguishable from the arguments advanced by the parties in La Gloria. See Plaintiffs' Response to Court Order of May 28, 2003 at 1; Defendant's Response to Court Order of May 28, 2003 at 1. The court ordered additional briefing seeking clarification with respect to the waiver issue and, in particular, directing the parties to identify and address the contract language or terms upon which the parties relied to support their respective arguments. See Order of July 31, 2003 at 2.

In their briefing in response to the court's Order of July 31, 2003, plaintiffs point to the same pre-negotiation briefing memoranda introduced into evidence in both this case and in La Gloria. Plaintiffs' Response to Court Order of July 31, 2003 (Pls.' Waiver Resp.) at 1. Plaintiffs also point to additional pre-negotiation briefing memoranda "subsequently obtained during discovery, which unmistakably demonstrate that DESC's established policy has always been that its illegal price adjustment clause is 'non-negotiable.'" Id. at 1-2. Plaintiffs add that, during oral argument on the summary judgment motions in La Gloria, defendant conceded that its illegal price adjustment clause in some of the same procurements at issue in this case was non-negotiable. Id. at 2 (citing Transcript of Oral Argument held on March 7, 2003 in La Gloria at 8-9, 58).

Defendant states in its responsive briefing that plaintiffs were not contractually prohibited from seeking to negotiate terms of the EPA clauses. Defendant's Response to July 31, 2003 Order (Def.'s Waiver Resp.) at 1. Defendant argues that in those contracts containing either a PMM (Petroleum Marketing Monthly) or BLS (Bureau of Labor Statistics) escalator clause, plaintiffs were entitled under part B(c) of Clause B19.33 "to ask the contracting officer to replace those publications if they were discontinued, or if their reporting methodology changed."[4] Id. at 2. Defendant adds that in those contracts

---

[4]Part B(c) of Clause B19.33 provided in pertinent part:

> In the event the reference price or interim reference price is discontinued, or its method of calculation is altered substantially, the parties shall mutually agree upon an appropriate and comparable substitute for determining the price adjustment described herein. The contract

using Platts (Platts Oilgram Price Report) or OPIS (Oil Price Information Service) as the price adjustment escalator, part (c)(6) of Clause B19.33 permits the parties to "mutually agree upon an appropriate and comparable substitute" if the contracting officer determines that the market price indicator "consistently and substantially fails to reflect market conditions." Id. at 2-3.

Defendant contends that, while DESC's "use of common adjustment provisions" was non-negotiable, nothing in the "cited documents . . . states or implies that the terms of the EPA clauses were non-negotiable." Id. at 4. Moreover, defendant argues, there is no evidence that plaintiffs knew about or relied upon the pre-negotiation briefing memoranda containing the statement that the use of the "common escalators [is] nonnegotiable." Id. at 3; see the following pages of the Appendix to Plaintiffs' Response to Court Order of July 31, 2003 (Pls.' Waiver App.) for a sampling of pre-negotiation memoranda: 2008 (for awards anticipated in September 1998), 2011 (for awards anticipated in June 1989), 2015 (for awards anticipated in February 1990), 2020 (for awards anticipated in March 1990), 2025-26 (for awards anticipated in September 1990), 2030-31 (for awards anticipated in March 1991), 2037-38 (for awards anticipated in September 1993), 2044-45 (for awards anticipated in March 1994), 2052 (for awards anticipated in March 1995), 2059 (for awards anticipated in September 1995), 2065 (for awards anticipated in March 1996), and 2072-73 (for awards anticipated in September 1996).

Plaintiffs do not dispute that they did not challenge the use of the illegal EPA clauses in the fuel supply contracts, but they claim that they did not know that the EPA clauses were illegal. See Pls.' Cross-Mot. at 68 nn.74 & 75; Def.'s Mot. at 30. Plaintiffs assert that the facts in this case preclude the application of the waiver doctrine because defendant "seek[s] to retain the benefit of its lawlessness," Pls.' Cross-Mot. at 75, and the record evidence demonstrates that "DESC expressly prohibited negotiations concerning the use of its illegal price adjustment clause," Pls.' Waiver Resp. at 2. See also Pls.' Cross-Mot. at 66-67 (arguing that inclusion of an illegal provision in a contract cannot be waived by a contractor).

In Chris Berg, Inc. v. United States, the Court of Claims found, on the facts of the case before it, that the applicable Armed Services Procurement Regulation (ASPR)

---

> shall be amended to reflect such substitute reference price or interim reference price, effective on the date the prior reference price or interim is discontinued or altered. In the event the parties fail to agree on an appropriate substitute, the matter shall be resolved in accordance with the DISPUTES clause of the contract.

Def.'s Waiver Resp. at 2.

provisions on mistaken bids "were written for the protection of bidders"[5] and that defendant's "award of the contract to plaintiff at the [mistaken] bid price, with knowledge of [the contractor's] mistake and over [the contractor's] protest, was a clear-cut violation of law" that entitled plaintiff to a legal remedy. 426 F.2d 314, 318 (Ct. Cl. 1970). The Court of Claims reasoned:

> If a regulation appears intended to define and state the rights of a class of persons, it is presumptively intended to benefit those persons. Fletcher v. United States, 392 F.2d 266, 183 Ct. Cl. 1 (1968).
>
> If officials of the Government make a contract they are not authorized to make, the other party is not bound by estoppel or acquiescence or even failing to protest. Nautilus Shipping Corp. v. United States, 158 F. Supp. 353, 141 Ct. Cl. 391 (1958).

Id. at 317.

In La Gloria, this court found the Federal Circuit's opinion in Beta Systems, Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988), to be instructive authority on the waiver issue now before the court.[6] La Gloria, 56 Fed. Cl. at 226. In Beta Systems, the Federal

---

[5]The particular Armed Services Procurement Regulation in effect at the opening of bids in Chris Berg stated:

> After the opening of bids, contracting officers shall examine all bids for mistakes. In cases of apparent mistakes, and in cases where the contracting officer has reason to believe that a mistake may have been made, he shall request from the bidder a verification of the bid, calling attention to the suspected mistake. If the bidder alleges a mistake, the matter shall be processed in the manner set forth below. Such actions shall be taken prior to award.

426 F.2d at 318 (quoting 32 C.F.R. § 2.406-1 (1967)).

[6]In La Gloria, the court also addressed the Federal Circuit's decision in American Telephone & Telegraph Co. v. United States, La Gloria, 56 Fed. Cl. at 226, in which the Federal Circuit noted that "'[t]he doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a DAR [defense acquisition regulation] or any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge.'" Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1381 (Fed. Cir. 2002) (quoting Whittaker Elec. Sys. v. Dalton, 124 F.3d 1443, 1446 (Fed. Cir. 1997)). Finding in La Gloria, however, that the facts of the case were substantially similar to the facts in Beta Systems, the court applied the Federal Circuit's reasoning in

Circuit stated:

> The government's insistence during negotiations on use of [the EPA clause] in its entirety, and the contractor's acquiescence, does not immunize the government from the consequences of failure of the EPA clause to comply with the law stated as in the DAR. "The [DAR] is law which governs the award and interpretation of contracts as fully as if it were made a part thereof." Chris Berg, Inc. v. United States, 426 F.2d 314, 317 (Ct. Cl. 1970); see also Firestone [Tire & Rubber Co. v. United States], 444 F.2d [547,] 553 [(Ct. Cl. 1971)]. If the [chosen price escalator] violated the DAR, the government can not, by law, benefit from it. Cf. United States Fidelity and Guaranty Co. v. United States, 676 F.2d 622, 630, 230 Ct. Cl. 355 (1982) ("a proven violation of an applicable statute or regulation may be enough to show that [government] conduct was arbitrary and capricious").
>
> The risk of unintentional failure of a contract term to comply with a legal requirement does not fall solely on the contractor.

838 F.2d at 1185-86.

This court opined in La Gloria that:

> [D]efendant is unable to invoke the waiver doctrine when the terms of the solicitation expressly prohibited bidders from challenging defendant's use of an unauthorized economic price escalation clause. The government appears to have benefitted from its market position with its resort to self-help measures to circumvent the terms of the FAR in the administration of its fuel supply procurements. In these circumstances, the court declines to apply [the] waiver doctrine.

56 Fed. Cl. at 226 (footnote omitted).

---

Beta Systems. La Gloria, 56 Fed. Cl. at 226.

Recent decisions addressing these Federal Circuit authorities and reaching alternative conclusions in the circumstances of the cases before the court include Hermes Consolidated, Inc. v. United States, No. 02-1460 C, 2003 U.S. Claims LEXIS 237 (Aug. 7, 2003) and Calcasieu Refining Co. v. United States, No. 02-1219 C, 2003 WL 22049528 (Fed. Cl. July 31, 2003).

Although plaintiffs were not prohibited from challenging the EPA clause by the express terms of the solicitation in this case, there is evidence in the record that the government disfavored any challenge to its use of the EPA clauses. Indeed, DESC explicitly stated in its pre-negotiation briefing memoranda that it deemed its price adjustment clause to be non-negotiable. See, e.g., Pls.' Waiver App. at 2008 (for awards anticipated in September 1998), 2011 (for awards anticipated in June 1989), 2015 (for awards anticipated in February 1990), 2020 (for awards anticipated in March 1990), 2025-26 (for awards anticipated in September 1990), 2030-31 (for awards anticipated in March 1991), 2037-38 (for awards anticipated in September 1993), 2044-45 (for awards anticipated in March 1994), 2052 (for awards anticipated in March 1995), 2059 (for awards anticipated in September 1995), 2065 (for awards anticipated in March 1996), and 2072-73 (for awards anticipated in September 1996). That documentary evidence, see id., would also support a finding that "[t]he government appears to have benefitted from its market position with its resort to self-help measures to circumvent the terms of the FAR in the administration of its fuel supply procurements." La Gloria, 56 Fed. Cl. at 226. DESC's articulated position regarding the non-negotiability of its EPA clauses could also support a finding of an "insistence" on use of the illegal EPA clauses in its fuel supply contracts. See Beta Systems, 838 F.2d at 1185. On the basis of the record before the court and the authority of Chris Berg and Beta Systems, the court denies defendant's motion for summary judgment that plaintiffs have waived their claims of illegality in this case.[7]

### F. Whether the Doctrine of Judicial Estoppel Compels the Same Fair Market Value Calculation to Which Defendant Stipulated in Pride Cos. v. United States

Plaintiffs allege that they are entitled to calculate the fair market value of the fuel they supplied using the same formula to which defendant stipulated in Pride Cos. Pls.' Cross-Mot. at 45. Arguing that principles of judicial estoppel are applicable here, plaintiffs urge the court to adopt the "Pride formula" to calculate the amount which plaintiffs are entitled to recover. Id.

Defendant argues that plaintiffs have failed to establish the prerequisites for application of the judicial estoppel doctrine as required by the Federal Circuit in Hybritech, Inc. v. Abbott Laboratories, 849 F.2d 1446 (Fed. Cir. 1988). Def.'s Reply at 43. Defendant contends that "a party in this circuit may abandon a position it litigated successfully against a different party unless the current adversary shows '(1) personal reliance on the decision granted in the prior suit, (2) prejudice to its litigation of the issues

[7]The doctrine of laches has not been raised by the parties in this case.

in the current suit by reason of the decision in the prior suit, or (3) . . . apparent misuse of the court.'" Id. (quoting Hybritech, 849 F.2d at 1453-54). Defendant asserts that plaintiffs in this case, Navajo and Montana, have failed to show either direct reliance on Pride Cos. or any litigation prejudice. Id. Defendant also states that there is no basis for the claim that defendant has misused the court. Id. at 43-44.

Considering substantially identical arguments in La Gloria, the court stated:

> Judicial estoppel is the well-settled doctrine that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." Davis v. Wakelee, 156 U.S. 680, 689, 15 S. Ct. 555, 39 L. Ed. 578 (1895). In Pride Cos., the defendant conceded liability, 2000 U.S. Claims LEXIS 213, at *2-3, and although defendant disputed whether plaintiff suffered any harm, see id. at *3, the parties stipulated to a formula for determining the fair market value of fuel in a market neighboring plaintiff's. Id. at *4. It is difficult to characterize defendant's position in Pride Cos. as a case where a party "succeeds in maintaining [a] position." Davis, 156 U.S. at 689, 15 S. Ct. 555. Rather, that position appears to be a litigating concession which did not yield success to defendant. In these circumstances, the calculation of fair market value in Pride Cos. does not appear to the court to be an apt subject for application of the doctrine of judicial estoppel.

56 Fed. Cl. at 225. The court denies plaintiff's motion for summary judgment that judicial estoppel binds defendant to the Pride Cos. formula in this case.

## III. Conclusion

For the foregoing reasons, defendant's motion for partial summary judgment is DENIED with respect to: (1) whether the EPA clauses used in plaintiffs' contracts were illegal; (2) whether the FAR deviations permit use of the EPA clauses in plaintiffs' contracts; (3) whether plaintiffs are entitled to recover under a quantum valebant theory; and (4) whether plaintiffs have waived their claims of illegality. Plaintiffs' cross-motion for partial summary judgment is GRANTED with respect to: (1) whether their contract prices were illegal; (2) whether the FAR deviations were valid; and (3) whether they are entitled to recover under a quantum valebant theory. Plaintiffs' cross-motion for partial summary judgment is DENIED with respect to the application of the judicial estoppel doctrine.

On or before November 13, 2003, the parties shall file a joint status report or, if the

parties cannot agree, separate status reports, proposing further proceedings in this case.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge